**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ANTHONY ROSIER WILSON,**<br><br>　　Plaintiff,<br><br>　　v.<br><br>**ANTHONY HEDGPETH,** Warden, Salinas Valley State Prison,<br><br>　　Defendant. | Case No.: 11-CV-06479 YGR<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS BY PERSON IN STATE CUSTODY** |

## INTRODUCTION

Petitioner Anthony Rosier Wilson seeks federal habeas relief from his state convictions. For the reasons set forth below, the petition for such relief is **DENIED**.

## BACKGROUND

**I.　CASE HISTORY**

On April 26, 2007, a Contra Costa jury found Petitioner guilty of murder with the special circumstance that the murder was convicted for the benefit of a criminal street gang. The trial court sentenced him to a term of life without parole in addition to a consecutive 25-years-to-life term for a gun enhancement. The court stayed the sentence of his additional conviction for gang participation.

On May 27, 2010, a California Court of Appeal affirmed the judgment in an unpublished decision. Subsequently, Petitioner filed a petition for review in the California Supreme Court, seeking review of the Court of Appeal's rejection of his direct review claims. The California Supreme Court denied review on September 22, 2010.

1   On December 20, 2011, Petitioner filed the instant Petition. On April 26, 2012, the Court
2 issued an Order to Show Cause, in which it found all of Petitioner's claims plausible. The Petition is
3 fully briefed, and is now ready for review on the merits.

**II.    FACTS**

The Court adapts its account of the facts from the summary set forth in the last reasoned opinion of the California state court, the California Court of Appeal decision on direct review of Petitioner's conviction. *People v. Wilson*, No. A119963, 2010 WL 2126726, at *1-5 (Cal. Ct. App. May 27, 2010).

### A.    Prosecution Case

Hugo Diaz testified he and the murder victim, Rodrigo Cadenas, spent part of the evening of December 23, 2005, at a gathering with friends in Diaz's home. Close to midnight, Cadenas and Diaz left the house in a car Cadenas had borrowed, to meet up with a friend in North Richmond. Cadenas, who was driving, was highly intoxicated.

Cadenas drove to the area of Third Street and Silver Avenue in North Richmond. This intersection was where the "Third and Silver" gang congregated to sell narcotics. According to Diaz, as Cadenas stopped at a stop sign at Third and Silver, three to five men approached the car. Diaz could see at least two of the men pull out guns. As the men approached the car, Cadenas sped through the intersection and turned right on Silver, traveling westbound. Cadenas hit a pedestrian in the knee approximately one-half block from the intersection, before side-swiping a green Nissan Armada parked on the north side of Silver Street. He also struck a white van later determined to belong to Robert Moore (aka "Poppy"), a Third and Silver gang member. The group chased Cadenas as he circled the block and returned to the intersection of Third and Silver. At that point, Cadenas got out of the car while it was still moving and ran west on Silver toward Second Street. Diaz stopped the car and got out and started to walk up Third Street, but was immediately surrounded by a group of men who pushed him and threw him down. Diaz heard gunshots a few seconds later.

Contra Costa Deputy Sheriff Christina Holder was the first to respond to a radio call reporting a shooting victim lying in a driveway on Second Street in North Richmond. The driveway was near the middle of the block, closer to Market Street than to Silver Street. Holder found Cadenas lying

partially in the road at the bottom of the driveway with a pool of blood around him and some brain matter next to his head.  He had injuries to his head, was not moving, and did not appear to be breathing.  An autopsy later determined Cadenas died of multiple gunshot wounds to the head.  He had been hit with as many as 10 shots from a nine-millimeter Glock pistol.  Eight of the shots had perforated his body and two more had grazed his skin.  The first shots were fired from at least several feet away.  At least three additional rounds were fired into Cadenas from less than two feet away.  Finally, as Cadenas lay on the ground, the shooter fired three "contact" wounds directly into Cadenas's forehead.

      Sheriffs recovered 10 nine-millimeter cartridge casings and two bullet fragments near Cadenas's body and two other casings were located at the corner of Second and Silver.  Other physical evidence, including a jacket, was recovered in the area.  The sheriffs were unable to find any percipient witnesses.  The lead investigator in the case, Detective Cary Goldberg, who was familiar with the difficulties of investigating gang-related violence in North Richmond, testified gang members congregating in the area where a crime takes place would typically flee the area before the police arrive, and finding witnesses willing to talk about what they saw is usually very difficult.

      Petitioner—whose street name was "Coush" or "Coush Bob"—was known by police to be the leader of the Third and Silver gang.  In fact, police considered him to be at the top of the drug pyramid in North Richmond.  Detective Shawn Pate testified virtually every street corner in the North Richmond area was controlled by a different "set" or "crew" of armed individuals who prospered by selling drugs at that location.  Each set or crew was an offshoot or subset of the gang that controlled the drug trade in North Richmond, whose members sometimes called themselves "Project Trojans."  To protect their drug income, sets would use force and violence to instill fear in the community so rival dealers would not try to encroach on their territory.  Although each set had its own territory, the North Richmond sets socialized together and worked in concert to keep outsiders from coming into North Richmond, which not infrequently required the use of violence and killings.  Petitioner controlled all of the North Richmond sets, and enjoyed a very large income from their sale of drugs.  Police surveillance established Petitioner drove a $90,000 Mercedes Benz as one of his vehicles, wore costly items of jewelry, and possessed four expensive homes at various locations in the county.

On December 21, 2005, the FBI began tapping the phones of Petitioner and Michael Johnson (aka "Project Mike"), believed to be Petitioner's second-in-command. The FBI had access to most of Petitioner's cellular telephone calls from December 21, 2005, to January 12, 2006. This was part of a joint gang investigation with local law enforcement in which Detective Pate was also participating. Through his previous gang work in North Richmond, Pate had cultivated contacts with informants in the community who in the past had helped Pate solve crimes. On the morning of the murder, Pate began contacting his sources to see what information he could obtain. He called a low-level gang member named Juwan Veal who previously had provided consistently reliable information. Veal was not aware of the Cadenas shooting when Pate first reached him. Pate asked him to go out and see what information he could pick up. Veal called back that afternoon and sounded very excited. He had been hanging out with his friend, fellow gang member Leonard Lakhan. Pate recounted Veal told him, "Coush Bob had done the killing, and that he had spoken to Mr. Lakhan and that Mr. Lakhan had provided him with details." The details included the fact the victim had been driving a car that sideswiped a vehicle owned by Tylesha Robinson (aka "Puff") and had struck a pedestrian named Daniel Humphries (aka "Dirty Dog" or "Dog").

At trial, Veal testified he had known Lakhan since they were young children. They were both members of drug crews in the neighborhood and had once been part of the same crew. On the day after the murder, Veal, Lakhan, and another friend were hanging out at Silver and Harrold Street, a few blocks west of the shooting site, when Lakhan asked Veal whether he had been outside the night before. Veal told him he had not, whereupon Lakhan said, "Well, you missed it, boy," and proceeded to describe the events. According to Veal, Lakhan said: "A Mexican come through drunk, man, he hit the cone on the block on 3rd. Sideswiped Tylesha's car. Hit Dog [Daniel Humphries].... Sideswiped a parked car. Then tried to bounce on and explain himself, man. [¶] ... [¶] Man, he got his head blew off, man, Coush blew that niggar's head off. Domed him." Veal explained "domed" meant shot in the head point blank. On cross-examination, Veal admitted that he could not remember whether Lakhan told him he actually witnessed the shooting.

After speaking to Veal, Pate notified the FBI agents involved in the wiretap investigation that Petitioner had been named as the shooter in the Cadenas murder. Even though Petitioner's cell phone

4

calls on the night of the murder were not recorded, a check of the wiretap information was able to confirm Petitioner had placed cell phone calls from the area of Third and Silver at the time of the murder, and had left the area shortly after it occurred. Detectives Pate and Goldberg decided the best course of action at that point was to feed limited information about the Cadenas investigation to Petitioner's known associates on the street, hoping Petitioner could be recorded discussing and reacting to the information on his cell phone. They began by feeding information to known associates of Petitioner that the police were looking for Puff and a gang member known as "Cheeseburger." Shortly after the information was put out, Petitioner told Robert Moore, referring to Cheeseburger and Puff, "Them little niggers didn't see shit no way." Moore and Petitioner then discussed attempts by other associates to find Cheeseburger, and Petitioner instructed Moore to tell Cheeseburger, "Nobody hit him with shit. He didn't get hit." In the same conversation, Moore told Petitioner, "Puff said she gonna say she didn't get hit," to which Petitioner responded, "Hell, yeah." The police had not fed any information about Cheeseburger and Puff being hit.

Pate then fed information about a jacket found at the scene. Petitioner discussed the jacket but commented that it was not involved in the shooting: "Why? There ain't no coat. [¶] ... [¶] ... Them motherfuckers are bootsy." Petitioner and the caller agree there was nothing to worry about concerning the jacket. Petitioner was also recorded discussing alternative explanations in case DNA was found on the shell casings, and the fact there was a Mexican passenger in the Toyota. This discussion took place before police even knew there had been a passenger with Cadenas.

The wiretap eventually uncovered a plan by Petitioner to purchase an automatic weapon in Oakland on January 7, 2006. When Oakland Police Department officers were about to move-in to arrest him, Petitioner spotted them and fled the location, leading the officers on a high-speed chase that ended miles away when Petitioner's vehicle struck another car. Inside Petitioner's car, under the right front passenger seat, police found a nine-millimeter Glock handgun later determined to have fired all 10 of the expended shell casings found at the site of Cardenas's murder. A few days after his arrest and release on bail, Petitioner was recorded on the wiretap discussing and agreeing with an unidentified female that if the police had evidence or suspected the Glock taken from his car was connected to Cardenas's killing, he would not have been allowed to make bail.

Ten months after the shooting, another gang member, Kay Daniels, who was in custody awaiting sentencing in a federal drug case, offered to testify against Petitioner in return for help in getting leniency in the federal case. At trial, Daniels testified he had been out buying marijuana at Third and Silver on the evening of the shooting, and had seen Petitioner sitting on the hood of his Mercedes Benz on Silver Avenue near Third Street talking to a female. According to Daniels, he returned home and was speaking with Craig Brown by cell phone three or four hours later. At some point during the conversation, Brown started narrating to Daniels what he was seeing on the street. He told Daniels a Hispanic guy had hit Cheeseburger and a female with the street name Puff. Brown was expressing amazement at what he was seeing. Still talking to Brown on his cell phone, Daniels left his house and started making his way toward Third and Silver. Over the cell phone, he heard a female voice screaming, "Baby, no, baby, no," followed by the sound of gunshots. The gun shots could be heard through the phone and on the street. Daniels stopped moving at that point and asked Brown what was going on. Brown said "Coush Bob had shot someone." Brown was saying, "[M]an, why you do that, man, why you do that." He told Daniels Coush had said he was "just going to pop him or put one in him," but he had instead shot him multiple times. Daniels spotted Brown when he reached Silver a moment later, and Brown repeated Coush had shot the man multiple times and "he didn't have to do it." Daniels also saw Coush's Mercedes-Benz driving off.

### B.    Defense Case

The defense called no witnesses. Defense counsel argued to the jury there was a reasonable doubt about Petitioner's guilt on a number of grounds. There were dozens of armed and dangerous men at the murder scene who could have been the shooter. Various circumstances cast doubt on whether Petitioner was the one who pulled the trigger. If anyone in that community knew to dispose of a gun after it has been used in a crime, it would have been Petitioner, who had not risen to the top of the drug trade by being careless. In addition, Petitioner would have understood an unnecessary shooting of this kind was bad for his drug business by bringing unwanted police attention to the area. If anything, Petitioner's possession of the weapon at the time of his arrest proves he did not know it was the murder weapon. He bought and sold Glocks all the time and must have unwittingly purchased the gun that turned out to have been used to kill Cadenas. Had he known it had been used

in a murder, he would not have kept it.  If he had known it was the murder weapon, he would have most likely left town after he was first arrested and released on bail.  Further, despite an extensive search, no blood evidence was found linking Petitioner to the crime even though (1) plenty of blood would have gotten on the shooter's clothes and shoes, (2) blood is hard to completely get rid of, and (3) the police were well aware of Petitioner's homes and cars and could have gotten search warrants to look for such evidence within one or two days of the crime.  If Petitioner had committed the crime and gone to the trouble of cleaning up all of the blood evidence, it made no sense that he would have kept the murder weapon in his car.

Counsel argued that the police, as a result of their own negligence, lost the most conclusive evidence of whether Petitioner committed the crime or not, by failing to check their wiretap in the hours immediately following the murder.  Counsel contended that the wiretap evidence that does exist proved, at most, that Petitioner did not want the actual shooter to be caught—either out of loyalty to his gang or because the shooter might be pressured into snitching on him.

Counsel also attacked the credibility of witnesses Leonard Lakhan, Juwan Veal, and Kay Daniels.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state, *see Baker v. Fleming*, 423

1  F.3d 1085, 1091-92 (9th Cir. 2005), which in the instant matter is the state appellate court decision on
2  direct review.  (Exhibits in Support of Writ of Habeas Corpus, No. 3 [Dkt. No. 2]).
3       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court
4  arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of
5  law or if the state court decides a case differently than [the] Court has on a set of materially
6  indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the
7  'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies
8  the correct governing legal principle from [the] Court's decisions but unreasonably applies that
9  principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal habeas court may not issue the
10 writ simply because that court concludes in its independent judgment that the relevant state-court
11 decision applied clearly established federal law erroneously or incorrectly. Rather, that application
12 must also be unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable
13 application" inquiry should ask whether the state court's application of clearly established federal law
14 was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

17      Petitioner raises two claims for habeas relief: (1) violation of due process and right to present
18 a defense based on the trial court's improper exclusion of evidence of third-party culpability; and (2)
19 Confrontation Clause, fair trial, and due process violations based on the admission of an informant's
20 hearsay testimony that Petitioner shot the victim.  The Court addresses each of these claims in turn.

21 **I.    FIRST GROUND: EXCLUSION OF THIRD PARTY CULPABILITY EVIDENCE**

22      Petitioner argues that the Court of Appeal erred by affirming the trial court's exclusion of
23 evidence of three FBI summaries of wiretap calls between Third and Silver gang members Moore
24 and Johnson where they purportedly "conspired to lie to the police and fabricate an alibi for Moore to
25 conceal evidence that Moore was at the murder scene."  (Petition at 19 [Dkt. No. 1].)

26     **A.    Due Process**

27      The due process clause guarantees the fundamental elements of fairness in a criminal trial.
28 *Estelle v. McGuire*, 502 U.S. 62, 70 (1991).  However, the admission of evidence is not subject to

federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of a fundamentally fair trial guaranteed by due process. *Henry v. Keman*, 197 F.3d 1021, 1031 (9th Cir. 1999). According to the U.S. Supreme Court, the exclusion of critical, corroborative defense evidence may violate the Sixth Amendment right to present a defense, as well as the due process right to a fair trial. *See DePetris v. Kuykendall,* 239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973); *Washington v. Texas,* 338 U.S. 14, 18-19 (1967)). However, the Due Process Clause does not guarantee the right to introduce "all relevant evidence." *See Montana v. Egelhoff,* 518 U.S. 37, 42 (1996). "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id.* (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 43 (quoting *Patterson v. New York,* 432 U.S. 197, 201-02 (1977)).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Id.* The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary, or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *Jammal*, 926 F.2d at 920.

       *i.*    *Facts*

The California Court of Appeal summarized the relevant facts as follows:

Petitioner sought to introduce evidence that, two days after the murder, Third and Silver gang members Moore and Johnson conspired to lie to the police and fabricate an alibi to conceal Moore's presence at the murder scene. Moore was a gang member who resided at 218 Silver, near the murder

9

scene. His van was observed leaving the scene shortly after the murder occurred, and the sheriffs wrote a search warrant for it the day after the shooting. Specifically, Petitioner sought to introduce FBI summaries of wiretap calls between Moore and Johnson which, he contends, would have raised in the jurors' minds reasonable doubts about his guilt.

The wiretaps show that at noon on December 26, 2005, Johnson told Moore to lie to the police about Moore's van being involved in the collision, to deny he had been in North Richmond recently, and to deny he knew anything about the homicide. Johnson also told Moore that he had store receipts he could give Moore so that Moore could tell police he was out Christmas shopping. In the second call, Johnson asked Moore if he had talked to that "[m]other [f]ucker," referring to Detective Pate, and Moore said Pate told him "someone hit his [v]an, and was killed after he hit it." In the third wiretap, Johnson told Moore to get his story straight with another gang member the police had connected to the van.

The trial court excluded the evidence on the grounds it was relevant, if at all, only to a potential motive Moore might have had in committing the crime—that is, anger over the damage to his van. It did not, in the court's view, provide any direct or circumstantial evidence Johnson or Moore actually committed the crime. Under California law, evidence going solely to a third party's motive or opportunity to commit the crime is not sufficient to raise a reasonable doubt about the defendant's guilt, and is therefore not admissible. *People v. Hall*, 41 Cal. 3d 826, 833 (Cal. 1986).

## ii. Analysis

Petitioner argues that the Court of Appeal mistakenly upheld the trial court's exclusion of the wiretap summaries, which could have led the jury to find that "Moore's attempt to manufacture an alibi was to avoid apprehension for the crime." (Petition at 21.) Specifically, Petitioner claims that, by excluding this evidence, the trial court violated federal law established by the Supreme Court in *Holmes v. South Carolina*, 547 U.S. 319 (2006), which held that a defendant's right to present a complete defense is impaired by the exclusion of evidence that is "arbitrary" or "disproportionate for the purposes they are designed to serve." (Petition at 21 (citing *Holmes*, 547 U.S. at 324)).

Respondent contends that, as the trial court found, the wiretap evidence only demonstrates that Moore may have had a motive for committing the crime, and that he was coordinating with

10

members of the gang to frustrate the police investigation. (Answer [Dkt. No. 7] at 7.) Respondent further contends that the trial court operated under its discretion to exclude evidence that is "repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." (*Id.* at 8 (quoting *Holmes*, 547 U.S. at 326-27).) Finally, respondent argues that the trial court's ruling did not constitute a due process violation because it did not exclude evidence with "persuasive assurances of trustworthiness" that was "critical" to the defense. (*Id.* at 11 (quoting *Chambers*, 410 U.S. at 302).)

For a state court ruling to be deemed "contrary to" established federal law, the state court must have arrived at a conclusion opposite to one reached by the Supreme Court on a question of law, where the two sets of facts are "materially indistinguishable" from one another. *Williams,* 529 U.S. at 412-13. "It is clearly established federal law, as determined by the Supreme Court, that when [evidence] bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation." *Chia v. Cambra,* 360 F.3d 997, 1003 (9th Cir. 2004) (*citing Chambers,* 410 U.S. at 302).

In *Chambers,* the defendant was convicted of shooting a police officer from behind a crowd of people that had gathered while police tried to execute a search warrant. 410 U.S. at 285—87. Before Chambers's trial, another man (McDonald) in the crowd confessed to the shooting to Chambers's counsel in writing. *Id.* at 287. McDonald also gave an oral confession to three separate friends within days of the shooting. *Id.* at 292-93. After he was arrested for the crime, he recanted the confession. *Id.* at 288. Chambers alleged that his due process rights were violated because he was not allowed to cross-examine McDonald, and because he was barred from introducing testimony of the three people to whom McDonald confessed because the trial court ruled it inadmissible hearsay. The Court held that Chambers was denied a fair trial in violation of Constitutional guarantees because, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302. Specifically, the Court held that the trial court erred in excluding the evidence of third party culpability because it was "made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300. The Court supplied four factors that

11

established "assurance of their reliability": (1) each was made spontaneously to a close acquaintance; (2) each was corroborated by other evidence in the case; (3) each was against McDonald's interest in a real sense; and (4) McDonald was present and available for cross-examination by the state. *Id.* at 300.

Here, the facts of *Chambers* are distinguishable. First, unlike McDonald's written and oral confessions, the wiretap evidence does not establish that Moore confessed to the crime. Second, whereas McDonald was seen with a weapon after the shooting, there is no corroborative evidence supporting the claim that Moore committed the crime—indeed, it was the Petitioner that was found in possession of the murder weapon. Third, while McDonald's confession was clearly against his interest, Moore's attempts to impede the police investigation are not comparably against his interest. Taking these facts as a whole, the circumstances do not establish that the wiretap summaries provide considerable assurances of reliability.

Similarly, the facts in *Holmes* are distinguishable. There, a defendant offered evidence that a third party (White) committed the rape and murder of an elderly woman. 547 U.S. at 323. The evidence included the testimony of several witnesses to whom White had confessed to committing the crime. *Id.* However, the South Carolina Supreme Court upheld the trial court's exclusion of the evidence "under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." *Id.* at 321. The U.S. Supreme Court reversed the conviction, because the "arbitrary" rule categorically excluded evidence of possible third-party culpability if the prosecution presented sufficiently strong evidence of the defendant's guilt, without testing the reliability of the prosecution's evidence. *Id.* at 329-30. Notably, the Court found that state judges are permitted to exclude evidence where their probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *See id*. at 325.

Unlike in *Holmes*, the judge in Petitioner's trial did not exclude the wiretap summaries under a rule that mechanically and categorically discounts evidence of third-party guilt in the face of a sufficiently strong showing by the prosecution. Rather, the court evaluated the probative value of the wiretap summaries and found that, at best, they raised an inference that Moore had a motive to

commit the crime. While the trial court and court of appeal both discussed the strength of the prosecution's evidence, their evaluation of the wiretap summaries applied the proper balancing test under California Evidence Code section 352: probative value against prejudicial impact. The *Holmes* Court specifically identified such rules, of which Federal Rule of Evidence 403 is an exemplar, as the sort of unproblematic, traditional rules of evidence that, when reasonably applied, do not raise due process concerns. *Holmes*, 547 U.S. at 326. Further, the trial court did not apply section 352 unreasonably: it properly weighed the probative value of the wiretap summaries against its potential for prejudice and found its probative value lacking. Consequently, because the trial court's exclusion of the wiretap summaries was neither "contrary to" clearly established federal law nor an "unreasonable application" thereof, its ruling did not violate Petitioner's due process rights. *See United States v. Sheffer,* 523 U.S. 303, 309-12 (1998) (excluding polygraph evidence does not violate defendant's constitutional right to present a defense; *per se* rule excluding such evidence is a "rational and proportional means of advancing the legitimate interest in barring unreliable evidence").

Finally, even if there were constitutional error, Petitioner is not entitled to federal habeas relief because he has failed to demonstrate that the error was not harmless under the *Brecht* standard. 507 U.S. at 637. In other words, Petitioner did not demonstrate that the error had a "substantial and injurious effect on the verdict." *Dillard v. Roe*, 244 F.3d 758, 767 n. 7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623). Even if the trial court's exclusion of third party culpability evidence was unconstitutional, Petitioner would still not have suffered actual prejudice. Petitioner argues that the overall trial evidence presented "a close question for the jury," because the admissible evidence was "underwhelming." (Petition at 24.) Specifically, Petitioner contends that "[a]side from Lakhan's inadmissible declaration . . . no one said that [Petitioner] committed the murder, either to the police or in surreptitiously recorded telephone calls. Moreover, the primary evidence against appellant was the testimony of unreliable informants." (Traverse at 4). The Court finds that the cumulative evidence, which includes Petitioner's possession of the murder weapon, wiretap conversations containing incriminating statements, and the evidence of contemporaneous eyewitness accounts implicating Petitioner as the shooter, is sufficient to withstand any injury presented by the exclusion of third party culpability evidence.

13

## II.  SECOND GROUND: ADMISSION OF INFORMANT'S TESTIMONY

### A.  Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 40, 403 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

The Confrontation Clause commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*; *see David v. Alaska*, 415 U.S. 308, 315-16 (1974). The Confrontation Clause applies to all "testimonial" statements. *Crawford*, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing of proving some fact." *Id.* at 51. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637).

#### *i.  Facts*

The state court of appeal set forth the facts regarding this claim as follows:

The admissibility of Veal's testimony about his conversation with Lakhan the day after Cadenas's murder was extensively litigated in the trial court. Petitioner's trial counsel moved in limine to exclude the testimony on the grounds it constituted hearsay impinging on Petitioner's Sixth Amendment confrontation clause rights since the prosecutor failed to lay an adequate foundation demonstrating Lakhan had personal knowledge of the shooting. Petitioner concedes that if Lakhan was a percipient witness to the shooting, Veal's testimony would be admissible as an exception to the hearsay rule under Evidence Code section 1235 as a prior inconsistent statement. Section 1235

applies because Lakhan testified he did not make the statements to Veal about the shooting and Veal testified he did. Petitioner's contention at trial and on direct appeal was that Lakhan's alleged statements to Veal were inadmissible under Evidence Code section 702, which provides, "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter."

In the trial court, both parties agreed the standard to be applied by the court under California law was whether there was evidence from which a rational trier of fact could find Lakhan had percipient knowledge of the events he described. (*See People v. Anderson*, 25 Cal. 4th 543, 573-574 (2001) ("'[T]he court may exclude the testimony of a witness for lack of personal knowledge only if no jury could reasonably find that he has such knowledge'") (italics omitted).) The trial court agreed with Petitioner that once the defense interposed an objection under Evidence Code section 702, it was the prosecution's burden to show the evidence was sufficient to satisfy the standard. Petitioner insisted there were no facts from which a reasonable juror could infer either that Lakhan was a percipient witness to the murder or that he was not.

The court reviewed the testimony of Veal and Lakhan at the preliminary hearing as well as the sheriff's department's report of its interview with Veal. The court noted the judge sitting as a magistrate's finding—based on Veal's and Lakhan's preliminary hearing testimony—that Lakhan was describing events based on his personal knowledge. The court found the judge's finding to be "informative as to whether a reasonable juror could reach the same conclusion," although not binding on the court. In addition, the court found Lakhan's "step-by-step description of the actions of both the victim in the car and the shooting itself" to be sufficiently detailed that it, too, supported a reasonable inference Lakhan was a percipient witness. Further, the court pointed to the fact that the details of the event recounted by Lakhan to Veal were largely corroborated by the statements Hugo Diaz made to the sheriff's department, to which Detective Goldberg had testified at the preliminary hearing.

### ii. *Analysis*

Petitioner first contends that "no foundation was laid proving that Lakhan was a percipient witness," and that his statements therefore are inadmissible hearsay. (Petition at 26.) Distilled to its

essence, Petitioner's theory is that in the absence of proof that Lakhan was a percipient witness, Lakhan must have simply parroted reports of the shooting heard from other persons. (*See id.* at 24-27; Traverse at 5-8.) As stated above, the trial court and Court of Appeal spent considerable time on this question. The trial court instructed the jury to consider the testimony only if it first found that Lakhan was present at the scene of the crime.[1] *See* 7 RT 1198-99. Further, the Court of Appeal found that the record provided substantial evidence from which a reasonable juror could conclude that Lakhan was a percipient witness. *See Wilson*, 2010 WL 2126726, at *7.

The Court finds that Petitioner is not entitled to federal habeas relief on this claim because the state court's rejection of the claim was not objectively unreasonable. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 409. Lakhan gave Veal specific and correct information regarding the murder within hours after it occurred, which allowed a reasonable juror to infer that Lakhan had firsthand knowledge of the shooting. Further, given Lakhan's involvement with the gang, he had a motive to falsely deny knowledge of the crime at trial for fear of retribution. Thus, there was sufficient evidence to support a reasonable finding that Lakhan was a percipient witness.

Finally, Petitioner claims that admission of Veal's testimony violated his right to confront and cross-examine witnesses against him as guaranteed to him by the Sixth Amendment. *Id.* Specifically, Petitioner contends that while he had the opportunity to cross-examine Lakhan at trial, he was "deprived of the right to cross-examine the original source(s) of the information: the person(s) who told Lakhan about the shooting." *Id.* at 26-27. Further, Petitioner argues that "it cannot be determined that the statement was not testimonial in nature, since there is no evidence regarding the source of that information nor the circumstance under which the statement was given." *Id.* at 27.

The argument fails for two reasons. First, the Court rejects any distinction between Lakhan and the "original source of the information." The jury had sufficient evidence to make a reasonable

---

[1] Petitioner contends that it was error to give the question to the jury in the first instance. (Traverse at 6.) Even assuming that were so, it would have been harmless error. The jury also heard evidence of Brown's contemporaneous narration to Daniels of the events leading up to the killing, in which Brown expressly identified Petitioner as the shooter. Though Daniels, while on the stand, denied his previous account of Brown's statements, the credibility of his in-court denial was thoroughly impeached. The jury would have heard sufficient evidence to find Petitioner guilty even without hearing Lakhan's statements to Veal.

determination that Lakhan was himself the source of the information he gave Veal. Further, Lakhan, the declarant, was available for cross-examination at trial. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).

Second, the Court rejects Petitioner's argument that Lakhan's statements to Veal were testimonial in nature. Under *Davis*, statements "are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency [requiring police assistance], *and* that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822 (emphasis added). Here, as detailed above, the conversation between Veal and Lakhan was a casual exchange, not an "interrogation." The U.S. Supreme Court has characterized statements made unwittingly outside the context of formal interrogation as "clearly nontestimonial." *Davis*, 547 U.S. at 825; *see also Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Moreover, at least two circuits have found that when a speaker makes statements to an undercover informant, or when the speaker does not reasonably expect his statements may be used at trial, they are not testimonial under *Crawford*. *See United States v. Hendricks*, 395 F.3d 173, 181 (3rd Cir. 2005) (holding that monitored private conversations were not testimonial because, among other reasons, "the speakers certainly did not make the statements thinking that they would be available for use at a later trial"); *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004) ("Thus we conclude that a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*."). Here, none of the circumstances would lead Lakhan to believe he was making statements that would be available at a later trial. Indeed, Lakhan's testimony at trial—where he claims never to have spoken with Veal—indicates that he would not have made those statements had he known that Veal was a government informant. Consequently, Lakhan's statements are nontestimonial under *Davis*, and Petitioner's Sixth Amendment rights have not been violated.

///

///

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Anthony Rosier Wilson's Petition for a Writ of Habeas Corpus.

This Order terminates Case No. 11-cv-6479.

**IT IS SO ORDERED.**

Date: December 16, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**